**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 26, 2023**

# In the Court of Appeals of Georgia

A23A0281. HARRISON et al. v. HARRISON.

DOYLE, Presiding Judge.

Marilyn Monique Harrison ("Marilyn"), along with her daughter, Marilyn Amari Harrison ("Amari"), sued Marilyn's brother, James C. Harrison, and JLMBL Investments, LLC, (collectively "the defendants") seeking to protect Marilyn's interest in property formerly owned by their late parents and to enforce the parties' purchase and sales agreement, and alleging claims for declaratory judgment, conversion, and specific performance. The defendants answered, asserting counterclaims and seeking equitable and injunctive relief. James moved for summary judgment in his own capacity, seeking specific performance of the default provisions in the purchase and sale agreement and reformation of the agreement. The trial court granted the motion, reforming the agreement, finding that Marilyn was in default, and

ordering that the property be sold within 30 days. Marilyn appeals the order, arguing that the trial court erred by granting summary judgment to James because (1) he lacked standing to assert his counterclaims after he sold the property to JLMBL; (2) James was not entitled to reformation of the purchase and sales agreement; (3) the court failed to apply the doctrine of ratification; and (4) James was not entitled to specific performance. For the following reasons, we reverse.

A trial court properly grants summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]"[1] "'On appeal from the grant of summary judgment, the appellate court conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.'"[2]

So viewed, the evidence shows that in 1986, Marilyn and James's parents ("the Father" and "the Mother") purchased property in College Park ("the Property"), and

---

[1] OCGA § 9-11-56 (c).

[2] *Erickson v. Bank of America, N. A.*, 345 Ga. App. 254 (812 SE2d 578) (2018).

on February 15, 2020, conveyed it to Marilyn and James in equal shares via a quitclaim deed. The Father and the Mother died on February 24, 2020, and November 3, 2020, respectively. At the time of her death, the Mother had a single Wells Fargo IRA account. Both James and Marilyn assumed that the IRA would be split equally between them.

In November 2020, Marilyn and James began to engage in discussions about the disposition of the Property. Marilyn wanted to purchase the property, and she and James negotiated the terms of a Purchase and Sale Agreement ("the Agreement") pursuant to which she would buy his half interest in the Property, vesting her with fee simple title. Sometime before November 19, 2020, James contacted Wells Fargo in an effort to obtain the IRA assets, and on November 21, 2020, he submitted a form claiming the entire value of the IRA and instructing Wells Fargo to move the IRA assets to his personal bank account, certifying under oath that he was the sole beneficiary of the entire value of the IRA, as well as an affidavit of domicile listing himself as the sole beneficiary. On December 3, 2020, James received notice that the IRA distribution had been approved, and he received $154,000 from the IRA in December; at that time, James had not told Marilyn that he was the sole beneficiary.

3

Meanwhile, Marilyn drafted the Agreement, which she and James executed on December 17, 2020. James failed to advise Marilyn at that time that she was not a beneficiary of the Mother's IRA, and she was unaware of that fact when she executed the Agreement. The Agreement provides in relevant part that Marilyn agreed to purchase the Property — "a house, . . . to include all structures and contents therein" upon the following relevant terms:

> The Purchaser agrees to pay Seller the total of . . . $130,000 . . . using a combination of (1) one up-front cash deposit; (2) the actual cash value from the Purchaser's share of the single inherited Wells Fargo (Wachovia) IRA that has an approximate value of . . . $133,000 . . . but is subject to increase in value, up to . . . $154,000 . . . , if annuity portion continues; and (3) quarterly cash payments based on actual cash value of said inherited IRA. . . .

> Once the initial non-refundable deposit of . . . $30,000 . . . has been satisfied, Purchaser agrees to relinquish her interest in the abovementioned inherited IRA and apply that amount toward the total purchase price of said property. Purchaser agrees to pay, in addition to the . . . $130,000 . . ., the mandatory income taxes of 35 [percent] and the withdrawal fee of 10 [percent] for the withdrawal equal to one half of the total value of the abovementioned IRA that would be the total of the Purchaser's interest in the . . . IRA. If the value of the . . . IRA is . . . $133,000 . . . , Purchaser's portion would equal . . . $65,500 . . . of which . . . $29,925 . . . must be paid by Purchaser to Seller for the

mandatory taxes and fees of withdrawal from said account. If the value of the . . . IRA is . . . $154,000 . . . , Purchaser's portion would equal . . . $77,000 . . . of which . . . $34,650 . . . must be paid by Purchaser to Seller for the mandatory taxes and fees of withdrawal from said account.

The Agreement included a calculation of installment payments due based on IRA values of $133,000 and $154,000. The Agreement also provided that "Seller agrees that if their portion is sold to a [third] party, the [third] party must adhere to all conditions outlined in this contract." Finally, the Agreement stated that it

includes the entire agreement of Purchaser and Seller. . . . This agreement, when executed by both Purchaser and Seller, shall contain the entire understanding and agreement between the Purchaser and Seller, with respect to the matter . . . referred to [herein] and shall supercede[] all prior or contemporaneous agreements[,] representations[,] and understanding[s] with respect to such matters.

On January 2, 2021, James advised Marilyn that the IRA funded at $154,000, but he did not inform her at that time that he was the sole beneficiary. On February 22, 2021, without notice to Marilyn, James conveyed his interest in the Property via quitclaim to JLMBL Investments, LLC, which he owns with his wife and son. Pursuant to the Agreement, still assuming that she was a 50 percent beneficiary of the

5

IRA, Marilyn paid James the up-front payment of $30,000 and the March quarterly installment payment of $19,217. Thereafter, on March 25, 2021, James advised Marilyn for the first time that she was not listed as a beneficiary on the IRA. On April 27, 2021, his attorney sent Marilyn a letter alleging that she had no interest in the IRA and demanding immediate payment in full under the Agreement.

Thereafter, on June 3, 2021 Marilyn and her daughter[3] filed their complaint against the defendants, seeking declaratory judgment, specific performance, and equitable and emergency injunctive relief and asserting claims for conversion and trespass. The plaintiffs also filed a motion for a temporary restraining order ("TRO") seeking to restrain the defendants from accessing the Property and removing personal property contained therein until final disposition of the lawsuit. With the consent of the defendants, the trial court entered a TRO. The defendants filed an answer and counterclaim seeking reformation of the Agreement to exclude reference to the contents of the house and to remove the provision stating that a portion of the purchase price would be paid from Marilyn's share of the IRA, claiming mutual mistake of fact. The defendants also counterclaimed for breach of contract/specific

_____

[3] The daughter lived in the home on the Property at the time pursuant to the Agreement.

performance, alleging that Marilyn was in default of the Agreement, and they sought a sale of the property based on her breach arising from her failure to maintain the landscaping and pay expenses for the Property. In June and September 2021, Marilyn paid into the registry of the court the remaining installment payments due under the Agreement.

James, acting in his individual capacity, moved for summary judgment, seeking specific performance of the default provisions in the Agreement and reformation thereof to exclude reference to the inclusion of the contents of the Property in the Agreement.[4] The plaintiffs responded to the motion, arguing that: James ratified the IRA credit as outlined in the Agreement by accepting her March 2021 installment payment after learning he was the sole beneficiary of the IRA and after receiving his distribution therefrom and that he was therefore required to convey its interest in the Property to her; that James lacked standing to proceed on claims under the Agreement based on his conveyance of the Property to JLMBL; that he was not entitled to reformation of the Agreement; and that he was not entitled to specific performance based on his lack of standing and breach of the Agreement.

---

[4] JLMBL did not move for summary judgment.

Following a hearing, in an order prepared by James's counsel, the trial court granted his motion for summary judgment on his claims for breach of contract/specific performance and reformation and on Marilyn's claim for specific performance, finding that she "defaulted under the [Agreement] by not paying the value of the IRA amount." The court reformed the contract to exclude reference to the house's contents, voided the TRO, ordered the "Parties" to cooperate in listing the Property, and ordered that James was entitled to keep the money Marilyn had already paid him and to receive disbursement of the amounts she paid into the court's registry, with the parties splitting the sale proceeds and Marilyn receiving a credit for monies paid. The summary judgment order did not address Marilyn's standing argument. This appeal followed.

1. Marilyn contends that the trial court erred by granting summary judgment to James and granting the relief set forth in the order because he lacked standing to do so after he conveyed all of his interest in the Property, including his contractual rights, to JLMBL. We agree.

OCGA § 9-11-17 (a) provides that "every action shall be prosecuted in the name of the real party in interest."

The purpose of this rule is to protect a defendant against another action brought by the party actually entitled to recover. In the case of an assignment of the rights under a contract, the assignee is usually the real party in interest. Further, it is a principle of our law that an assignee of a contract acquires its rights from the assignor, has no more rights under the contract than the assignor, and is subject to all the defenses that could have been raised against the assignor.[5]

Here, James conveyed his interest in the Property to JLMBL after he and Marilyn executed the Agreement and before the plaintiffs filed suit against the defendants, naming JLMBL as a party defendant, and before the defendants asserted their counterclaims. The summary judgment motion was brought in James's individual capacity, and JLMBL did not join the motion. Thus, pretermitting whether summary judgment in favor of JLMBL was proper, it did not move for that relief, nor did the court grant summary judgment to JLMBL. And by conveying the Property to JLMBL, James lacked standing to pursue his counterclaim for breach of contract/specific performance based on Marilyn's purported default of the Agreement,

---

[5] (Citations and punctuation omitted.) *Town & Country Dodge, Inc. v. World Omni Financial Corp.*, 261 Ga. App. 503, 504 (1) (583 SE2d 182) (2003).

9

and the trial court erred by granting summary judgment to James on his counterclaim and on Marilyn's claim for specific performance.[6]

2. Marilyn also argues that the trial court erred by granting summary judgment to James on his claim for reformation of the contract regarding the contents of the Property.[7] We agree. Pretermitting the enforceability of the Agreement, James is not entitled to reformation.

In an affidavit, James stated that he and Marilyn exchanged multiple drafts of the Agreement, that none of the drafts he submitted contained a provision regarding the contents of the Property, and the final version the parties agreed to via text did not contain any such provision. According to James, when the parties met to sign the Agreement, Marilyn insisted that they sign a copy she had printed; he reviewed only the payment section of the contract he signed because "she represented that there were no changes to the contract." James averred that the parties never discussed

---

[6] See id. at 505 (1) (vacating summary judgment ruling in favor of a party who was not the real party in interest).

[7] As a party to the Agreement, James has standing to assert a counterclaim for reformation. See OCGA § 23-2-34 ("Equity will grant relief as between the original parties or their privies in law, in fact, or in estate, except bona fide purchasers for value without notice.); *Moore v. McBryar*, 290 Ga. App. 725, 728-729 (659 SE2d 789) (2008).

including the contents of the Property in the Agreement, and that he "would never have signed the contract if [he] had known that Marilyn . . . wanted to include the contents of the Property in the sale."

Marilyn agrees that the parties never specifically discussed including the contents of the Property in the purchase price. Nevertheless, as she explained in her deposition, she wanted the contents of the home in the contract, she assumed that the parties contemplated including them, and she incorporated that provision in the initial version of the contract, which she prepared by "copying and pasting from other web sites about buying and purchasing property in the state of Georgia, and so [the provision including the contents in the sale] was just a common statement that was in the contract." She also included it in all of the other versions of the contract she prepared, including the one the parties ultimately signed.[8]

---

[8] According to Marilyn, when James sent her revisions to the contract, she "would simply go into the document that [she] had initially . . . [and would] put it in or take things out or whatever, but that was the revision that [they] both agreed on in the end. That was the last one [she] sent to him, [t]hat is the one he signed."

"'A mutual mistake in an action for reformation means one in which both parties agree to the terms of the contract, but by mistake of the scrivener the true terms of the agreement are not set forth.'"[9] Further, if

> a party seeks to be relieved in equity, from the effect of a mistake, he must show due diligence on his part. Courts of equity grant relief only in favor of the diligent. While equity will, on seasonable application and under proper circumstances, relieve a party from the injurious consequences of an act done under a mistake of fact, it will not do so if such party could by reasonable diligence have ascertained the truth as to the matter concerning which the mistake was made.[10]

Here, there is no mutual mistake. James alleges that he did not intend to include the contents of the Property in the sale, and Marilyn testified that she did so intend.[11]

---

[9] *Morris v. Morris*, 282 Ga. App. 127, 132 (4) (637 SE2d 838) (2006), quoting *Cox v. U. S. Markets*, 278 Ga. App. 287, 289 (2) (628 SE2d 701) (2006).

[10] (Punctuation omitted.) *First Natl. Bank of Polk County v. Carr*, 260 Ga. App. 439, 441 (2) (579 SE2d 863) (2003), quoting *City of Jefferson v. Trustees of Martin Institute*, 199 Ga. 71, 77-78 (1) (33 SE2d 354) (1945).

[11] James argues that Marilyn's statements in a subsequent affidavit — specifically, that "[i]n negotiating the purchase of the Property, I always intended on purchasing both the Property and all personal property contained therein" — contradicted her deposition testimony and should be construed against her pursuant to *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 28-30 (1) (343 SE2d 680) (1986) (holding that on motion for summary judgment, when a respondent offers self-contradictory testimony by the party-witness on a dispositive issue, if the contradiction is not adequately explained, the contradictory testimony must be

Reformation is not warranted if only one party makes a mistake, nor if — as happened here[12] — the party seeking reformation failed to read the agreement.[13] And

> a party who has the capacity and opportunity to read a written contract cannot afterwards set up fraud in the procurement of his signature to the instrument based on [extra-contractual] representations that differ from the terms of the contract. Statements that directly contradict the terms of the agreement . . . simply cannot form the basis of a fraud claim for the purpose of cancelling or rescinding a contract. In fact, the only type of fraud that can relieve a party of his obligation to read a written contract and be bound by its terms is a fraud that prevents the party from reading the contract.[14]

> There is no such evidence in this case. Finally, if, as here,

> the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the contractual language used by the parties must be

construed against the respondent). We find no contradiction here.

[12] James initialed each page of the Agreement, and according to Marilyn, she watched as he read each page before signing it.

[13] See *Carr*, 260 Ga. App. at 241, n. 8., citing *Layfield v. Sanford*, 247 Ga. 92, 93 (274 SE2d 450) (1981), *Langston v. Langston*, 147 Ga. 318, 320 (93 SE 892) (1917).

[14] (Citations and punctuation omitted.) *Novare Group, Inc. v. Sarif*, 290 Ga. 186, 188-189 (2) (718 SE2d 304) (2011).

afforded its literal meaning. Where a conflict exists between oral and written representations, it has long been the law in Georgia that if the parties have reduced their agreement to writing, all oral representations made antecedent to execution of the written contract are merged into and extinguished by the contract and are not binding upon the parties. In written contracts containing a merger clause, [such as in the instant case] prior or contemporaneous representations that contradict the written contract cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud.[15]

Accordingly, the trial court erred by granting James's reformation counterclaim regarding the contents of the Property.

*Judgment reversed. Gobeil, J., and Senior Appellate Judge Herbert E. Phipps concur.*

---

[15] (Citations and punctuation omitted.) *First Data POS, Inc. v. Willis*, 273 Ga. 792, 794-795 (2) (546 SE2d 781) (2001).